IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
January 6, 2015 Session

**STATE OF TENNESSEE v. TRAVIS LAMONTE STEED**

**Appeal from the Criminal Court for Madison County**
**No. 12-523    Donald H. Allen, Judge**

---

**No. W2014-00146-CCA-R3-CD  -  Filed May 14, 2015**

---

The defendant, Travis Lamonte Steed, was convicted by a Madison County Criminal Court jury of first degree felony murder; second degree murder, a Class A felony; felony reckless endangerment, a Class E felony; convicted felon in possession of a handgun, a Class E felony; and attempted second degree murder, a Class B felony. The court sentenced the defendant as a Range I, violent offender to concurrent sentences of life for the felony murder conviction and twenty-five years for the second degree murder conviction. The court sentenced the defendant as a Range II, multiple offender to twenty years for the attempted second degree murder conviction and four years each for the felon in possession of a handgun and felony reckless endangerment convictions. The court ordered that the defendant serve the four-year sentences for felony reckless endangerment and felon in possession of a handgun concurrently to each other but consecutively to the twenty-year sentence for attempted second degree murder. The court also ordered that the defendant serve the twenty-year sentence for attempted second degree murder consecutively to the life sentence, for a total effective sentence of life plus twenty-four years in the Department of Correction. The defendant raises three issues on appeal:  (1) whether the evidence is sufficient to sustain his murder and attempted murder convictions; (2) whether the jury's verdicts finding him guilty of first degree felony murder and attempted second degree murder are mutually exclusive; and (3) whether the trial court erred in ordering consecutive sentencing. Following our review, we affirm the judgments of the trial court but remand for entry of corrected judgments to reflect that the defendant's second degree murder conviction is merged into his felony murder conviction.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**
**and Remanded for Entry of Corrected Judgments**

ALAN E. GLENN, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and ROGER A. PAGE, JJ., joined.

George Morton Googe, District Public Defender; and Gregory D. Gookin, Assistant Public Defender, for the Defendant-Appellant, Travis Lamonte Steed.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Counsel; James G. Woodall, District Attorney General; and Shaun A. Brown, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

**FACTS**

On the night of February 26, 2012, a party in a downtown Jackson nightclub ended in gunfire that left over a dozen people injured and one man dead. The defendant was subsequently indicted by the Madison County Grand Jury with the premeditated first degree murder of LeCarlos Todd, the first degree felony murder of Todd in the perpetration of the attempted first degree premeditated murder of Triveno Freeman, the attempted first degree premeditated murder of Freeman, the aggravated assault of Jarvis Rockamore, the aggravated assault of Solomon Robinson, and being a felon in possession of a handgun.

Jerry Gardner, who was the agent for Karma Ultra Lounge in February 2012, testified that on the night of February 26, 2012, the club was holding a homecoming party for Lane College, with a little over 200 in attendance. At approximately 2:00 a.m., he was standing outside the front door to the club when he heard gunfire and saw patrons running out of the club. He went around the side of the building, saw people coming out the back door, and then went back around to the front. The gunfire started up again as he was about to go inside the front door, so he went to the end of the building to raise the double garage doors. When the building finally cleared out, he saw the defendant crawl out the door and roll over onto his back.

Investigator Ron Pugh of the Jackson Police Department's Violent Crimes Unit identified the copy he had made of the club's surveillance footage of the incident, which was admitted as an exhibit and played for the jury.

Officer John Reese of the Jackson Police Department testified that at 2:00 a.m. on February 26, 2012, he responded to a shots-fired call at the Karma Lounge in downtown Jackson. The scene was chaotic, with "people running everywhere," and by the time he had taken two steps from his patrol car, a man came up to him and said he had been shot. After calling for an ambulance, Officer Reese began making his way toward the building. En route, he encountered a second injured person lying on the sidewalk and a third, later identified as the defendant, lying in front of the garage doors. He stopped to assist the

2

defendant, who had a fractured wrist, blood coming from his leg, and an entrance wound to his torso, while his partner, Officer Arnold, continued inside the building, where several people were performing CPR on a "totally unresponsive" victim.

When he went inside the club to help sweep for suspects, Officer Reese observed cell phones, IDs, blood and blood trails, several projectiles and .45 and .380 casings, and a semi-automatic .45 caliber Smith and Wesson, which was located near the bar. On cross-examination, he testified that he personally encountered twelve or thirteen different gunshot victims at the scene.

Officer Michael Arnold of the Jackson Police Department testified that when he arrived at the club a few minutes after 2:00 a.m. on February 26, 2012, he observed "hundreds of people trying to get out from inside the club," as well as several people with gunshot wounds. He entered the club to secure the scene and found an unresponsive victim, later identified as LeCarlos Todd, lying on the floor behind the DJ booth with a gunshot wound to the upper left side of his chest. Several individuals were standing around him, and a young woman was beside him attempting CPR. He pulled away the young woman and the other individuals, checked Todd's vital signs, found that he had no pulse and was not breathing, and began performing CPR himself. He continued performing CPR after EMS arrived, stopping only after Todd had been loaded into the ambulance.

Officer Arnold testified that after EMS transported Todd from the scene, he went back inside the club, where he observed shell casings, a magazine lying in the middle of the floor on the lower level of the club, and a handgun by the bar. He started to clear the handgun to make it safe but then realized that it was "stove-piped," or jammed, and therefore left it alone without touching it.

Officer Joseph King of the Jackson Police Department testified that he responded to the scene to find "massive chaos," with gunshot victims exiting the club, other victims lying on the ground, and "vehicles . . . leaving in a hurry." As he got out of his patrol vehicle, he was approached by several gunshot victims asking for help. After directing them to either the hospital or EMS, he continued toward the nightclub, where he observed the defendant lying on the ground in front of the door with multiple gunshot wounds.

Sergeant Shane Beaver of the Jackson Police Department, who was down the street from the Karma Lounge at the time of the shooting, testified that he first noticed some people running from the club and then heard what sounded like gunshots. He drove to the club, pulling up close to the front door as a "stampede of people" came out of the building, with some rushing through the doors, others breaking windows to climb out, and still others trampling each other in their haste to escape. Sergeant Beaver testified

that the first victim he came into contact with was the defendant, who was lying directly in front of the business. He said he went inside the club, where an officer was performing CPR on another gunshot victim who was "for the most part already deceased[,]" and then went back outside, where "a bunch of other people just started coming back with gunshot wounds." He stated that the worst injuries were to the deceased victim and to the defendant. The other gunshot victims, who numbered "in the teens," had "superficial wounds" to the bottoms of their feet, the backs of their legs, or to their ankles.

Sergeant Beaver identified himself on the club's video of the scene, which was again played for the jury. He testified that he did not observe any weapon around the defendant but inside the club found numerous shell casings and projectiles, as well as the gun that was lying on the floor in the vicinity of the bar.

Dr. Thomas Deering, a forensic pathologist who was present during the autopsy of Todd's body, testified that the cause of death was multiple gunshot wounds, with Todd having suffered a "through and through" gunshot wound to each thigh and a gunshot wound to the torso in which the bullet entered the left upper chest, traveled downward into the chest cavity, hit the left lung, the heart, and the aorta, and finally lodged in one of the vertebra of the backbone on the right side of the victim's back. On cross-examination, he acknowledged he could not determine in what position Todd had been when shot or whether the wounds to his legs came from the same weapon as the wound to his torso.

Memphis resident Triveno Freeman, nicknamed "Veno," a former Lane College student, testified that he attended the February 26, 2012 homecoming party at the Karma Lounge with several Memphis friends, including Solomon Robinson, nicknamed "Solo," two individuals nicknamed "Itchy," and LeCarlos Todd. Sometime around 1:30 a.m., he was walking across the crowded dance floor with some of his Memphis friends when he grabbed a young woman's hand in an attempt to get her phone number. A man who was walking with the woman responded by knocking into him with his shoulder, and the two of them then got into a brief physical fight, exchanging several blows, until the man fell down. At that point, Freeman said, he continued to the DJ area of the club, where he told all his "Memphis people" what had just happened. A little later, the man he had fought came up to the DJ area, shook "Mitchell's" hand, apologized, and told him that everything was "cool." Freeman and his Memphis friends then began to relax. Approximately eight or nine minutes later, however, a man Freeman did not know, but whom he identified in the courtroom as the defendant, walked up to the Memphis group, pulled out a handgun, pointed it directly at Freeman, and fired two or three shots.

4

Freeman testified that he was struck by a bullet on his right elbow and that he initially froze in shock. He said the people who were standing with him, including LeCarlos Todd, fell back when the defendant started shooting and that Robinson, who was standing right behind Todd, responded by pulling out a .45 handgun and shooting at the defendant. The defendant ran toward the middle of the dance floor, returning fire as he ran, while Freeman ran toward the back door of the club, where he paused for a few seconds to see if his "partner, Solo, g[o]t out," before exiting the club. Freeman testified that the door he exited led to a side street, where "some random car," driven by a former Lane College student that he recognized as not being from Jackson, stopped, picked him up, and took him to the hospital.

Freeman testified that he did not initially tell the police what had happened because he was afraid that Robinson would get into trouble. He said that he did not have a gun and that he never saw anyone besides Robinson and the defendant with any weapon. On cross-examination, he acknowledged that he lied in statements he gave to police on February 26 and March 4, 2012, by, among other things, not telling the police that he was involved in a physical fight at the club, saying that the person he saw shooting a gun had a "low haircut" instead of dreads, telling the police that he saw two men shoot into the ground, and not saying anything in his second statement about having seen the defendant firing a gun at him.

Jarvis Rockamore, another former Lane College student who attended the 2012 homecoming party at the club, testified that he was talking with some friends at the DJ area when the defendant tapped him on the shoulder and said something along the lines of "Let me talk to V[e]no." The defendant walked up to Triveno Freeman in an aggressive manner and said something that Rockamore was unable to hear before taking a step back. One of Rockamore's friends yelled out that the defendant had a gun, and the defendant replied, "[Y]eah, I got a gun," as he waved it toward Rockamore and his friends, who had all jumped back and were standing together in the corner against the wall. Next, the defendant fired the gun directly into the crowd of men. Rockamore testified that he fell back and LeCarlos Todd fell on top of him. He said he was not shot but was afraid for his life. Looking to the left, he saw "Little Itchy," or "Jacq," pull a gun out of his coat and cock it. Although he did not see him fire the weapon, he was "pretty sure" that he did. He did, however, see the defendant, who was "running low" down the stairs of the club, still shooting as he ran toward the front door.

Rockamore testified that after the initial shooting had stopped and he was about to get up, the gunfire started again and he looked up to see Solomon Robinson standing by the bathroom shooting a handgun. When the shooting was over, Rockamore picked Todd up, saw that he was dead, and then exited the club with his friends through the back door.

5

He said he did not know the defendant at the time of the shooting but later identified him as the shooter from a photographic array he was shown by the police.

On cross-examination, Rockamore insisted that his February 29, 2012 statement to police in which he said, "Itchy and the dude with dreads started firing," was not inconsistent with his testimony that the defendant fired his gun first and that he "kn[e]w for a fact [the defendant] shot first." He acknowledged that in his preliminary hearing testimony, he said that he did not see anyone besides the defendant with a gun. He further acknowledged that he had pled guilty to criminal impersonation in 2009. On redirect, he explained that he was confused during the preliminary hearing and thought he was being asked if he saw anyone else with the defendant who had a gun.

Lane College student Solomon Robinson, who attended the homecoming party with his friends, including LeCarlos Todd, testified that he was in the VIP area of the club when the fight occurred. He said he then left the VIP section and was leaning against a rail between the VIP section and the DJ area when the defendant, who had some other people behind him, walked up to the DJ booth, said something, backed up, lifted his shirt to show the gun that was in his waistband, and then pulled the gun out and started shooting at the group of people that was standing with Robinson, which included Triveno Freeman and LeCarlos Todd. Robinson said he was not hurt but was "traumatized" and scared for his life. He stated that he dropped to the floor, crawled to the corner, and began shooting back with his "45 Highpoint." The defendant ran down the stairs and Robinson followed, shooting at him. The defendant fired back, and Robinson fell down and got behind the DJ booth. He did not know where the defendant went after that. Robinson said he started to get up but then heard more gunshots originating from somewhere else, so he stayed down a couple more seconds until the shooting stopped. He then ran out the back door, taking his gun with him.

Robinson testified that he had never seen the defendant before that night. On cross-examination, he said he brought the gun with him to the club "for protection," because he was expecting to run into trouble. He said he did not see either Mitchell Jones, nicknamed "Cuz Boo," or "Jacq" Mitchell with a gun that night. He acknowledged that he lied in his March 5 statement to police by saying that he did not have a gun himself and never saw anyone at the club with a gun. On redirect examination, he said he told the police the truth in a March 7 statement, in which he related the events just as he had in his direct examination testimony. On re-cross examination, he conceded that he was released from jail after speaking with the investigator and that no charges were brought against him for his role in the shooting.

Marvin Hall, a recent Lane College graduate who was still a student at the time he attended the homecoming party at the club, testified that he was standing by the DJ booth

with "Little Drink" and others when a man he had never seen before, whom he identified in the courtroom as the defendant, walked up to the DJ booth and, after pacing back and forth for a minute or two, pulled out a gun and began shooting at the group of people who were standing with Hall. Hall said he was grazed in the head, hip, and thigh. He did not know how many times the defendant fired and did not see anyone else with a gun but he heard "[p]lenty" of gunfire. He was certain that the defendant fired first.

Hall testified that he eventually got up from his position of cover and left out the back door of the club. As he was exiting, he saw "Josh" and "Cuz Boo." "Cuz Boo" told him that Todd was "down" and gave him a pistol. Although hesitant, he took the weapon, placed it under the passenger seat of his car, and gave his car keys to "Josh" before having his girlfriend drive him to the hospital in her vehicle. He never saw the weapon again. On cross-examination, he acknowledged that when interviewed by the police immediately after the shooting, he claimed not to have seen who was doing the shooting.

Aimee Oxley, the director of the property and evidence unit for the Jackson Police Department and a senior certified crime scene analyst, identified and described photographs she took of the crime scene and various items that were collected into evidence, including a bullet recovered from the murdered victim's back; spent .40, .45, and .380 caliber projectiles and casings, a Smith and Wesson .45-caliber magazine, and the Smith and Wesson pistol, which were recovered from various locations inside the club; a Taurus PT 945 with magazine and four ACP hollow point ammunition, which was submitted to the evidence room by Officer Mullins; and a bullet recovered from the defendant's buttocks.

Officer James Mullins of the Jackson Police Department testified that at 2:30 a.m. on February 26, 2012, he responded to the report of a suspicious vehicle at the Walgreens on the corner of Campbell and Highland, in which a male driver, identified as Joshua Matthews, appeared to be passed out at the wheel. During the inventory of that vehicle, he and his fellow officers found a Taurus 45, which he subsequently transported to the property and evidence room at the Jackson Police Department.

Sergeant John Gause of the Jackson Police Department testified that he recovered a .45 caliber semi-automatic Highpoint handgun during the March 5, 2012 execution of a search warrant at 405 Division Street.

Sergeant Danielle Jones of the Jackson Police Department identified the evidence envelope containing a bullet that was recovered from the defendant's buttocks, which she collected into evidence on February 26, 2012, from the Jackson-Madison County General Hospital.

7

Sergeant Chris Chestnut of the Violent Crimes Unit of the Jackson Police Department described his investigation of the shooting, which included his collection of buccal swabs from various suspects in the case and Jarvis Rockamore's February 29, 2012 identification from a photographic array of the defendant as the man who shot LeCarlos Todd. On cross-examination, he testified that in other photographic arrays, Rockamore identified Jacque Mitchell as "Little Itchy who shot the Jackson, Tennessee man with dreads" and Solomon Robinson as "Solo" "the man . . . responsible for shooting the Jackson dude in Karma."

Investigator Aubrey Richardson of the Jackson Police Department's Violent Crimes Unit testified that she participated in the collection of buccal swabs from Solomon Robinson and Mitchell Jones.

Tennessee Bureau of Investigation ("TBI") Special Agent Forensic Scientist Eric Warren, an expert in firearms identification and ballistics analysis, testified at some length regarding his examination of the various weapons, projectiles, and casings submitted in the case. On cross-examination, he testified that he examined a total of fourteen bullets, twenty-five cartridge cases, and three weapons and was able to determine that one bullet and four cartridge cases came from the Smith and Wesson, three bullets and four cartridge cases came from the Taurus pistol, and four bullets and eight cartridge cases came from the Hi-Point pistol. All of the weapons he examined were .45 caliber, but there were casings and/or projectiles from at least two unknown weapons – a .380 caliber and a .40 caliber.

TBI Special Agent Forensic Scientist Donna Nelson, an expert in DNA analysis, testified that the barrel of the .45 Smith and Wesson contained the DNA profile of an unidentified male individual. The trigger and slide of the weapon contained a mixture of genetic material from at least two different individuals, with eight of nine markers consistent with the DNA profile of Jacque Mitchell and three of nine markers consistent with the DNA profile of Solomon Robinson. She found DNA from an unidentified male on the handle of the .45 Taurus pistol and a mixture of genetic material from that same unidentified male and another unidentified male on the trigger of the weapon. She was unable to locate any DNA on the Hi-Point .45 pistol.

At the conclusion of the State's proof, the trial court granted the defendant's motion for judgment of acquittal as to count three of the indictment, which charged the defendant with the aggravated assault of Jarvis Rockamore causing serious bodily injury. The defendant elected not to testify and rested his case without presenting any evidence. Following jury deliberations and a subsequent bench trial on the convicted felon element of the weapons charge, the defendant was convicted of the second degree murder of Todd

as a lesser offense of the first degree premeditated murder of Todd charged in count one of the indictment, the first degree felony murder of Todd in the perpetration of the attempted first degree premeditated murder of Triveno Freeman, as charged in count two of the indictment, felony reckless endangerment as a lesser offense of the aggravated assault against Solomon Robinson charged in count four of the indictment, being a convicted felon in possession of a handgun as charged in count five of the indictment, and the attempted second degree murder of Triveno Freeman as a lesser offense of the attempted first degree premeditated murder of Freeman charged in count six of the indictment.

At the sentencing hearing, the State introduced the defendant's presentence report as well as certified copies of his prior convictions, probation violations, and community corrections revocation orders. The State also introduced documents to show that the defendant was on bond and on parole when the instant offenses occurred.

The deceased victim's mother, Charlotte Todd Watson, testified that her son was only nineteen years old when murdered, was a good child who was never in any trouble, and had been enrolled at Lane College with a bright future ahead of him that was cut short by his untimely death. She said she forgave the defendant but believed that he should remain in prison for the remainder of his life to prevent him from causing the same kind of pain to another family.

Solomon Robinson testified the entire Lane College community had been affected by the defendant's actions, and he was of the opinion that the defendant should remain in prison for the rest of his life.

The thirty-two-year-old defendant opted not to speak and presented no evidence on his behalf at the sentencing hearing.

The trial court found the following enhancement factors applicable to all the offenses: the defendant had a previous history of criminal convictions or behavior in addition to those necessary to establish his range; the defendant, before trial or sentencing, failed to comply with the conditions of a sentence involving release into the community; and, at the time the felonies were committed, the defendant was on parole status for some offenses and had been released on pretrial bail or bond status in at least one other pending case. See Tenn. Code Ann. § 40-35-114(1), (8), (13) (2014). The trial court found enhancement factor (9), the defendant possessed or employed a firearm during the commission of the offenses, applicable to counts one and six and enhancement factor (10), the defendant had no hesitation about committing a crime when the risk to human life was great, applicable to count six. See id. § 40-35-114(9), (10). The court found no applicable mitigating factors.

9

The trial court sentenced the defendant as a Range I offender to concurrent terms of life for the felony murder conviction and twenty-five years at 100% for the second degree murder conviction. The court sentenced the defendant as a Range II, multiple offender to the maximum terms of four years at 35% for the reckless endangerment conviction, four years at 35% for the convicted felon in possession of a handgun conviction, and twenty years at 35% for the attempted second degree murder conviction. Finding that the defendant was an offender whose record of criminal activity was extensive and that he committed the felony offenses while on parole from other felony convictions, the trial court ordered that the four-year sentences for reckless endangerment and convicted felon in possession of a handgun be served concurrently to each other but consecutively to the twenty-year sentence for attempted second degree murder. The court additionally ordered that the twenty-year sentence be served consecutively to the life sentence, for an effective term of life plus twenty-four years in the Department of Correction, to be served consecutively to the sentences for which the defendant was on parole at the time he committed the instant offenses.

## ANALYSIS

### I. Sufficiency of the Evidence

The defendant challenges the sufficiency of the evidence in support of his felony murder, second degree murder, and attempted second degree murder convictions. In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)).

"A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

## A. First Degree Felony Murder

To sustain the conviction for first degree felony murder, the State had to prove beyond a reasonable doubt that the defendant killed LeCarlos Todd during his attempt to commit the first degree premeditated murder of Triveno Freeman. See Tenn. Code Ann. § 39-13-202(a)(2). "Premeditation" is defined as

an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id. § 39-13-202(d).

The "element of premeditation is a question of fact" for the jury to determine based upon a consideration of all the evidence. State v. Suttles, 30 S.W.3d 252, 261 (Tenn. 2000) (citing State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997)). "[P]remeditation may be established by any evidence from which a rational trier of fact may infer that the killing was done 'after the exercise of reflection and judgment' as required by Tennessee Code Annotated section 39-13-202(d)." State v. Davidson, 121 S.W.3d 600, 615 (Tenn. 2003). A jury may infer premeditation from circumstantial evidence surrounding the crime, including the manner and circumstances of the killing.

11

See State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998); State v. Addison, 973 S.W.2d 260, 265 (Tenn. Crim. App. 1997). There are several factors which our courts have concluded may be evidence of premeditation: "the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime; and calmness immediately after the killing." Bland, 958 S.W.2d at 660. Additional factors from which a jury may infer premeditation include the defendant's failure to render aid to the victim, see State v. Lewis, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000), and evidence establishing a motive for the killing. See State v. Nesbit, 978 S.W.2d 872, 898 (Tenn. 1998).

Viewed in the light most favorable to the State, the evidence is sufficient to sustain the jury's finding that the defendant killed Todd during his attempt to commit a premeditated killing of Freeman. The State's evidence showed that Freeman and another man had engaged in a brief fist fight on the dance floor and that the man later apologized to one of Freeman's associates, causing Freeman's group of friends, who were gathered together around the DJ booth, to relax under the belief that tensions had subsided. Some eight or nine minutes later, however, the defendant walked up to the same group of Freeman's friends, asked to speak to Freeman, pulled out a gun, and, aiming directly at Freeman, began shooting his weapon, in the process striking and killing Todd. From the evidence presented at trial, the jury could reasonably infer that the defendant was a friend or associate of the man Freeman fought and was motivated to kill the unarmed Freeman as retaliation for Freeman's earlier fist fight with his friend. As the State points out, this court has upheld convictions for felony murder even where the jury has acquitted the defendant of the underlying predicate felony. See, e.g., State v. Shane Michael Grogger, No. M2008-02015-CCA-R3-CD, 2009 WL 3832921, at *14 (Tenn. Crim. App. Nov. 17, 2009), perm. app. denied (Tenn. Apr. 14, 2010). We conclude, therefore, that the evidence is sufficient to sustain the defendant's conviction for the first degree felony murder of Todd.

## B. Second Degree Murder

To sustain the second degree murder conviction, the State had to prove beyond a reasonable doubt that the defendant committed a knowing killing of LeCarlos Todd. See Tenn. Code Ann. § 39-13-210(a)(1). "In second degree murder, the result of the conduct is the sole element of the offense. . . . The statute focuses purely on the result and punishes an actor who knowingly causes another's death." State v. Ducker, 27 S.W.3d 889, 896 (Tenn. 2000). "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b). "A person can act knowingly irrespective of his or her desire that the conduct or result will occur." State v. Gray, 960 S.W.2d 598,

604 (Tenn. Crim. App. 1997) (citing State v. Rutherford, 876 S.W.2d 118, 120 (Tenn. Crim. App. 1993)).

Viewed in the light most favorable to the State, the evidence is sufficient to sustain the jury's finding that the defendant committed a knowing killing of Todd. The State's eyewitnesses testified that the defendant walked up to Freeman, who was standing in the middle of a group of men, pulled out his gun, and began firing at Freeman, in the process striking not only Freeman but also Todd, who died of his wounds. The jury could reasonably conclude that the defendant was aware that his conduct of firing a gun into a group of close-standing men in a crowded nightclub, regardless of his intended target, was reasonably certain to cause the death of one or more of the men in the group. We conclude, therefore, that the evidence is sufficient to sustain the defendant's second degree murder conviction.

### C. Attempted Second Degree Murder

To sustain the defendant's conviction for attempted second degree murder, the State had to prove beyond a reasonable doubt that the defendant attempted to commit a knowing killing of Triveno Freeman. The defendant argues that the evidence at trial "would have, at most, supported a verdict of guilt for the offense of Attempted Voluntary Manslaughter," because provocation, in the form of Freeman's having punched the defendant's associate on the dance floor, existed for firing his gun at Freeman. The jury, however, found the defendant guilty of attempted second degree murder, despite being instructed on the elements of attempted voluntary manslaughter as a lesser offense. By so doing, the jury obviously rejected the defendant's claim of provocation. When viewed in the light most favorable to the State, the evidence is more than sufficient to sustain the jury's verdict. According to the eyewitnesses, there was a fairly significant lapse of time between the cessation of the fist fight and the defendant's opening fire on Freeman with his gun. There was enough time, in fact, for the man who had fought Freeman to come up to Freeman's group to apologize to "Mitchell" for his actions, causing Freeman and his friends to begin to relax. We conclude, therefore, that the evidence is sufficient to sustain the defendant's conviction for attempted second degree murder.

### II. Mutually Exclusive Verdicts

The defendant next contends that the jury's verdicts finding him guilty of the attempted second degree murder of Freeman and the first degree felony murder of Todd, with the predicate underlying felony being the attempted first degree premeditated murder of Freeman, are mutually exclusive and therefore should be overturned and the case remanded for new trials on those offenses. In the alternative, he argues that the felony murder conviction should be reduced to second degree murder. The defendant

13

acknowledges that the doctrine of mutually exclusive verdicts has not been adopted in Tennessee and that the issue is currently pending before our supreme court in State v. Marlo Davis, No. W2011-01548-CCA-R3-CD, 2013 WL 2297131 (Tenn. Crim. App. May 21, 2013), perm. app. granted (Tenn. Nov. 13, 2013). The State responds by arguing that the doctrine of mutually exclusive verdicts, even if adopted in Tennessee, affords the defendant no relief because the separate convictions contain no conflict in mental state and involve different victims. The State also points out that consistency in verdicts is not required in Tennessee. We agree with the State.

This court thoroughly addressed the doctrines of "mutually exclusive verdicts" and "inconsistent verdicts" in a recent case:

> In states that recognize the doctrine [of mutually exclusive verdicts], it applies when "a guilty verdict on one count logically excludes a finding of guilty on the other." State v. Chris Jones, No. W2009-01698-CCA-R3-CD, 2011 WL 856375, at *10 (Tenn. Crim. App. March 9, 2011), perm. app. denied (Tenn. Aug. 25, 2011) (quoting Jackson v. State, 577 S.W.2d 570, 573 (Ga. 2003)). In finding the defendant guilty on both counts, the jury "necessarily reache[s] two positive findings of fact that cannot logically mutually exist." Id.; see also State v. James Snipes, No. W2011-02161-CCA-R3-CD, 2013 WL 1557367, at *8 (Tenn. Crim. App. April 12, 2013), perm. app. denied (Tenn. Sept. 13, 2013). For example, verdicts would be mutually exclusive if the jury returned a guilty verdict "on two counts arising from the same act where one count requires proof of a negligent act and the other count requires evidence of an intentional act." James Snipes, 2013 WL 1557367, at *8; see also Chris Jones, 2011 WL 856375, at *10.
>
> Conversely, inconsistent verdicts "arise when a defendant is convicted of one offense and acquitted of another offense, although both offenses arose from the same criminal transaction." James Snipes, 2013 WL 1557367, at *8. "The key difference between the two doctrines is that mutually exclusive verdicts involve two positive findings of fact, whereas inconsistent verdicts involved one positive finding of fact and 'the failure to make a positive finding of fact.'" Chris Jones, 2011 WL 856375, at *10 (quoting Jackson, 577 S.W.2d at 57).
>
> Inconsistent verdicts have long been permitted in both the state and federal systems. Such verdicts were first recognized in Dunn v. United States, 284 U.S. 390, 393 (1932). In that case, the defendant was convicted of maintaining a common nuisance by keeping intoxicating liquors for sale at a specified location but was acquitted of the possession and sale of

14

intoxicating liquors, even though the evidence was the same for all three counts. In upholding the verdict, the United States Supreme Court stated:

> The most that can be said in such cases is that the verdict shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt. We interpret the acquittal as no more than their assumption of a power which they had no right to exercise, but to which they were disposed through lenity.
>
> That the verdict may have been a result of compromise, or of a mistake on the part of the jury, is possible. But verdicts cannot be upset by speculation or inquiry into such matters.

Id. at 393-94 (quotation marks and citations omitted).

Over 50 years later, the same court upheld the Dunn jury lenity rationale to support inconsistent verdicts in United States v. Powell, 469 U.S. 57 (1984). Further, the Powell Court noted that the Dunn rule "embodies a prudent acknowledgment of a number of factors." First, "inconsistent verdicts -- *even verdicts that acquit on a predicate offense while convicting on the compound offense* -- should not be necessarily interpreted as a windfall to the Government at the defendant's expense." Powell, 469 U.S. at 65 (emphasis added). In such cases, there is no way to tell why the jury returned an inconsistent verdict, but when it happens the Government is precluded from redressing any perceived error on appeal by application of the Double Jeopardy Clause. Id.

. . . .

Second, the Powell Court reasoned that a defendant misunderstands the nature of inconsistent verdicts when he argues that an acquittal on a predicate offense necessitates a finding of insufficient evidence for the compound offense. Id. at 68. Such argument "necessarily assumes that the acquittal on the predicate offense was proper -- the one the jury 'really meant.' This, of course, is not necessarily correct; all we know is that the verdicts are inconsistent." Id. at 68. Because appellate courts cannot know the jury's motivations in reaching their verdicts, inconsistent verdicts are not subject to review. Id. at 68-69.

15

The Tennessee Supreme Court specifically adopted the <u>Dunn</u> jury lenity rationale in <u>Wiggins v. State</u>, 498 S.W.2d 92, 93 (Tenn.1973). In so doing, the court stated, "Consistency in verdicts for multiple count indictments is unnecessary." <u>Id.</u> at 94. Under <u>Wiggins</u> each count is treated as a separate indictment. <u>Id.</u> at 95. Accordingly, in reviewing the verdict, this Court looks solely to the evidence underlying the convicted offense to determine whether there is sufficient evidence to permit a rational fact finder to find the defendant guilty beyond a reasonable doubt. <u>State v. Cynthia J. Finch</u>, No. E2011-02544-CCA-R3-CD, 2013 WL 6174832, at *13 (Tenn. Crim. App. Nov. 22, 2013). "We will not attempt to divine some hidden meaning from the jury's actions regarding a separate count of the indictment."

<u>State v. Calvin Ellison</u>, No. W2013-02786-CCA-R3-CD, 2014 WL 6977725, at *7-9 (Tenn. Crim. App. Dec. 10, 2014) (footnotes omitted).

We agree with the State that the jury's verdicts are not mutually exclusive and that sufficient evidence exists to sustain each conviction on the separate counts of the indictment, regardless of any inconsistency involved in the jury's findings. We, therefore, conclude that the defendant is not entitled to relief on the basis of this issue.

We note, however, that the trial court, concerned that the felony murder conviction might not be upheld because of the defendant's conviction for a lesser included offense on the predicate underlying felony, did not merge the second degree murder conviction into the felony murder conviction. "[O]rdinarily, when a defendant is convicted of both felony murder and second degree murder on alternative theories, the trial court will merge the conviction for second degree murder into the conviction for felony murder[.]" <u>State v. Paul Lee Whited</u>, No. M1998-00478-CCA-R3-CD, 1999 WL 1209786, at *10 (Tenn. Crim. App. Dec. 17, 1999) (citing <u>State v. Jason Cross</u>, No. 03C01-9805-CC-00181, 1999 WL 592225, at *5 (Tenn. Crim. App. Aug. 9, 1999)). "[W]hen only one person has been murdered, a jury verdict of guilt on more than one count of an indictment charging different means of committing . . . murder will support only one judgment of conviction for [the] murder." <u>State v. Cribbs</u>, 967 S.W.2d 773, 788 (Tenn. 1998). Accordingly, we remand to the trial court for entry of corrected judgments reflecting that the second degree murder conviction is merged into the felony murder conviction.

### III. Consecutive Sentencing

Lastly, the defendant contends that the trial court erred in ordering consecutive sentencing. He acknowledges his extensive criminal record and the fact that the instant offenses were committed while he was on parole but argues that concurrent sentencing,

given his life sentence, is sufficient "to appreciate the gravity of [the] offenses while serving to protect the public."

We review the trial court's consecutive sentencing determinations for an abuse of discretion, with a presumption of reasonableness afforded to the trial court's decision. See State v. Pollard, 432 S.W.3d 851, 860 (Tenn. 2013) (applying same deferential standard announced in State v. Bise, 380 S.W.3d 682 (Tenn. 2012) to trial court's consecutive sentencing decisions).

We find no abuse of discretion in the trial court's sentencing determinations. The trial court may, in its discretion, order multiple sentences to run consecutively if it finds by a preponderance of evidence that one or more of the seven factors listed in Tennessee Code Annotated section 40-35-115(b) apply, including that the defendant is an offender whose record of criminal activity is extensive or that the defendant committed the offenses while on *probation*. Id. § 40-35-115(b)(2)(6) (emphasis added). Although not entirely clear, the trial court appeared to find that factor (6) of the consecutive sentencing statute was applicable based on the fact that the defendant was on parole at the time he committed the offenses. Although a consecutive sentence is mandatory when a defendant is sentenced for a felony committed while on parole from another felony, see Tenn. R. Crim. P. 32(c)(3)(A), subsection (6) of Tennessee Code Annotated section 40-35-115(b), which grants the trial court discretion to order consecutive sentencing in certain cases, applies only when a defendant commits a felony while on probation. See State v. Tracy Thomas Hepburn, No. M2008-01979-CCA-R3-CD, 2010 WL 2889101, at *10 (Tenn. Crim. App. July 23, 2010), perm. app. denied (Tenn. Jan. 13, 2011) (citations omitted). Regardless, subsection (1) of the consecutive sentencing statute applies and provides ample basis for the trial court's discretionary imposition of consecutive sentences. Accordingly, we affirm the sentences imposed by the trial court.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court but remand for entry of corrected judgments to reflect that the second degree murder conviction is merged into the first degree felony murder conviction.

_____
ALAN E. GLENN, JUDGE

17